UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

D'ANGELO SHAUN LUX,

Plaintiff,

v.

Case No. 23-cv-0786-bhl

RAY BORO, et al,

Defendants.

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In this civil rights lawsuit, Plaintiff D'Angelo Lux claims that three Whitewater Police Officers—Ray Boro, Hayden Beecroft, and Taylor Krahn—violated his Fourth and Fourteenth Amendment rights when they tased him multiple times following a traffic stop. (ECF Nos. 14 & 44.) Defendants seek summary judgment, arguing that the record establishes that their use of force was objectively reasonable, and, even if the Court found otherwise, they are entitled to qualified immunity. (ECF Nos. 51 & 52.) The Court agrees that the summary judgment record establishes that Officer Krahn's use of force was objectively reasonable. But factual disputes preclude resolution of Lux's claims against the other two officers at summary judgment, and those claims will therefore proceed to trial. Accordingly, Defendant's motion will be granted but only in part.

## BACKGROUND

On September 4, 2021, at roughly 12:45 a.m., D'Angelo Lux was driving in Whitewater, Wisconsin with several passengers in his car. (ECF No. 61 ¶¶7, 9; ECF No. 65 ¶12.) According to Officer Ray Boro, Lux failed to stop at a stop sign[1] and then turned sharply into a parking spot. (ECF No. 61 ¶7.) As Officer Boro turned on his emergency lights to initiate a traffic stop, Lux and his passengers left the car. (*Id.* ¶¶9, 12.) Officer Boro identified himself as a police officer,

[1] The parties dispute whether Lux drove through the stop sign without stopping. (ECF No. 61 ¶7.) As Lux is not challenging the propriety of the stop itself, this dispute is immaterial to his excessive force claim.

called Lux by his first name, and ordered him and the passengers to get back in the car. (*Id.* ¶¶10, 16.) He then called for backup. (*Id.* ¶18.)

As the passengers returned to the vehicle, Officer Boro began speaking with Lux and they both directed the passengers to stop talking. (*Id.* ¶23.) By then, a small group of additional observers had started gathering at a nearby intersection. (*Id.* ¶¶21, 24.) In response, Officer Boro again requested backup. (*Id.* ¶25.) Lux asked if he could stand outside the car and Officer Boro told him he could either sit in the vehicle or on the curb. (*Id.* ¶¶27–28.)

About six minutes later, Officers Beecroft and Krahn arrived on foot. (*Id.* ¶29.) Walworth County Deputies Latone and Weston also arrived. (*Id.* ¶30.) As Officer Boro spoke to the bystanders at the intersection, Officers Beecroft and Krahn spoke with Lux on the sidewalk. (*Id.* ¶31.) Officer Boro then returned to Lux's vehicle, apologized for his tone, and thanked the passengers for complying. (*Id.* ¶32.) Officer Boro told the passengers that they could leave, but most stayed at the scene, standing near the intersection. (*Id.* ¶34.) Officer Boro returned his attention to Lux and asked him for his license and registration. (*Id.* ¶35.) As Lux complied, the nearby passengers and bystanders continued to occasionally shout comments. (*Id.* ¶¶35–36.)

Officer Boro believed Lux was intoxicated, and Lux admitted he had consumed alcohol. (*Id.* ¶¶37–39.) Accordingly, Officer Boro conducted three field sobriety tests: horizontal gaze nystagmus, walk-and-turn, and one-leg stand. (*Id.* ¶40.) Lux asked multiple questions before beginning the walk-and-turn test and took several small steps in which he failed to place his heel in front of his other toe. (ECF No. 54-2 at 11:30–13:18.) When asked to perform the one leg stand test, Lux asked Officer Boro to do the test first (he declined) and then proved unable to maintain his balance, placing his foot down multiple times, and failing the test. (*Id.* at 13:30–14:47.)

As Lux finished the test, he crossed his arms on his chest. (ECF No. 55-4 at 18:02.) When Officer Boro asked him to provide a breath test, Lux refused. (*Id.* at 18:00–18:01.) Officer Boro then told Lux he was under arrest, put both his hands on Lux's arm, and told Lux to place his hands behind his back. (*Id.* at 18:04–18:07.) Three other officers assisted by grabbing Lux's other arm and shoulder. (*Id.* at 18:07–18:12.) Lux responded, saying "woah, that happened so fast." (*Id.* at 18:07–18:08.) The parties dispute whether Lux then actively resisted the officers by stiffening his arms and moving his body as they attempted to move his hands behind his back, or whether his movement was due to the officers. (ECF No. 61 ¶70.)

As the other officers were holding Lux's arms, Officer Beecroft shouted "taser, taser, taser" and deployed his taser at Lux's abdomen. (ECF No. 61 ¶76; ECF No. 55-4 at 18:14–15.) The parties dispute whether the first taser probes "achieve[d] neuromuscular incapacitation," but they became imbedded in Lux's torso. (ECF No. 61 ¶76.) Lux insists he was incapacitated by this initial deployment, but Defendants assert the probes did not incapacitate him. (*Id.*) Officer Boro then deployed his taser, first shooting his taser's probes into Lux's lower back and then pressing the taser's fixed probes into Lux's right hamstring to complete a circuit and cause neuromuscular incapacitation. (*Id.* ¶77; ECF No. 55 ¶69.) The parties agree that at this point Lux was incapacitated and he fell backwards to the ground. (ECF No. 61 ¶¶77, 80–82; ECF No. 56-2 at 15:11–15:14.)

The parties also offer different versions of Officer Boro's actions as Lux fell. Officer Boro claims he attempted to slow Lux's fall and assist him to the ground by grabbing his upper body. (ECF No. 61 ¶83.) Lux insists that Officer Boro forced or threw him to the ground. (ECF No. 64 ¶51.)

Once on the ground, Lux was facedown with his arms under his torso. (ECF No. 54-2 at 15:07–15:08.) Officer Krahn repeatedly yelled, "You're going to get it again," (*id.* at 15:09–15:12), while the other officers ordered Lux to put his hands behind his back. (*Id.*) Officer Boro tased Lux in the back of his left leg, Lux's torso jerked upwards, and the other officers began to handcuff him. (ECF No. 61 ¶89; ECF No. 54-2 at 15:12–15:14.) As Lux was being handcuffed, Officer Boro had his knee on the back of Lux's legs. (ECF No. 61 ¶91.) Officer Beecroft pressed his knee into Lux's back and shoulder. (*Id.* ¶92.) Officer Beecroft and Boro's taser logs show fourteen seconds of cumulative activation. (ECF No. 61 ¶95.) Once Lux was prone and handcuffed on the ground, Officer Krahn stood up and left to order the bystanders to step back and stay where they were. (ECF No. 56-2 at 15:18–19:12.)

Lux was then rolled onto his side and moved into a seated position, with the episode lasting about four minutes. (ECF No. 55-4 at 18:30–21:54.) The officers later removed some taser probes from his abdomen. (ECF No. 61 ¶106.) The parties dispute whether all the probes were removed, with Lux claiming that some taser probes were still attached when he was taken to the Walworth County Jail after his arrest. (*Id.*; ECF No. 64 ¶50.) The parties also dispute whether Lux was injured during the incident. Defendants assert Lux had no injuries and declined medical attention.

(ECF No. 61 ¶105.) Lux claims he had abrasions on his head and bruises on his arms and legs. (*Id.*)

A later blood test showed Lux had a blood-alcohol concentration of 0.134. (ECF No. 61 ¶107.) Lux was cited for operating with a prohibited alcohol concentration, first offense, failure to stop at a stop sign, and operating while under the influence, and these citations were later heard in the City of Whitewater Municipal Court. (*Id.* ¶¶115–17.) Lux was initially charged with resisting or obstructing an officer, but this charge was later dismissed as part of a plea agreement. (*Id.* ¶120.)

## LEGAL STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could influence the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Upon such a showing, the burden shifts to the opposing party to "make a showing sufficient to establish the existence of an element essential to that party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). This burden is not onerous, but the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

If the parties assert different characterizations of the facts, the Court must view the record in the light most favorable to the nonmoving party. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The Court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021). "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

"Video evidence that conclusively shows what happened allows a court to set aside factual disputes and decide what clearly established rules of law govern." *Perez v. Guetschow*, 173 F.4th 862, 865 (7th Cir. 2026) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But it "isn't the *existence* of a video recording, but its *quality*, that enables a court to conclude without a trial that one side rather than another must be right about the facts." *Id.* (citing *Raddant v. Douglas County*, 170 F.4th 583, 590–92 (7th Cir. 2026); *Steinhoff v. Malovrh*, 170 F.4th 647, 653–54 (7th Cir. 2026) (emphasis in original)). When the contents of a video recording remain open to dispute, video will not allow the Court to step into the jury's role. *Id.*

**ANALYSIS**

Lux claims that all three Defendants used excessive force against him. Defendants argue that the undisputed facts establish that their use of force was reasonable. (ECF No. 52 at 10–16.) More specifically, they contend that Officers Boro and Beecroft's actions were objectively reasonable and that Officer Krahn used only minimal, objectively reasonable force against Lux. (*Id.* at 9, 12–14.) In the alternative, Defendants assert they are entitled to qualified immunity. (*Id.* at 16.)

The Fourth Amendment prohibits police officers from using excessive force in the context of an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of force used during an arrest is judged from the perspective of a reasonable officer at the scene and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The force employed must be proportional to the threat posed. *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (finding that while first taser deployment against a suspect was

justified due to uncertainty of threat, once suspect was on the ground and unarmed, subsequent taser deployments were unreasonable).

Significant force, including the use of a taser, is unreasonable when a suspect is only passively resisting, has stopped resisting, or has been subdued. *Alicea v. Thomas*, 815 F.3d 283, 288, 292 (7th Cir. 2016); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014); *Abbott v. Sangamon County*, 705 F.3d 706, 732 (7th Cir. 2013). The Seventh Circuit has approved officers' use of significant force as reasonable when used against a suspect who is actively resisting arrest, which can include, among other things, "kicking and flailing," "swatting an arresting officer's hands away while backpedaling," and "declining to follow instructions while acting in a belligerent manner." *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (citing *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010); *Brooks v. City of Aurora*, 653 F.3d 478, 481 (7th Cir. 2011)). In determining whether multiple taser deployments are reasonable and proportional uses of force, the Court must examine how the interaction proceeds, and how the suspect reacted to being tased, including factors like whether the suspect remains incapacitated or stops moving, or recovers from incapacitation and attempts to remove taser probes or harm police officers. *Dockery*, 911 F.3d at 468; *Clarett*, 657 F.3d at 674–75.

## I. Disputed Facts Preclude Summary Judgment on Lux's Claims Against Officers Boro and Beecroft.

Defendants argue that Officers Boro and Beecroft are entitled to summary judgment because the record confirms their use of force during Lux's arrest was objectively reasonable. (ECF No. 52 at 10–16.) Defendants also contend that Officers Boro and Beecroft are entitled to qualified immunity. (*Id.* at 16.) Having reviewed the record, including the relevant video evidence, the Court is unable to resolve these claims at summary judgment. Simply put, the parties offer competing versions of the relevant events and the video evidence does not confirm either side's version in a conclusive fashion, making summary judgment inappropriate. *See Perez*, 173 F.4th at 865. Viewing the summary judgment record in the light most favorable to Lux, a reasonable jury could find Officers Boro and Beecroft used excessive force while arresting him. *See Cyrus*, 624 F.3d at 863; *Alicea*, 815 F.3d at 292. The disputed facts also preclude granting qualified immunity.

**A. Officers Boro and Beecroft Are Not Entitled To Summary Judgment.**

Defendants' summary judgment argument hinges on video evidence from the officers' body worn cameras, which they contend resolves all factual disputes and requires the entry of summary judgment in Officer Boro and Beecroft's favor. (ECF No. 61.) The mere existence of video evidence, however, does not eliminate all genuine disputes of material fact. *Perez*, 173 F.4th at 865. The content and quality of the video are crucial. *Id*.

Defendants overstate the significance and clarity of the video evidence. The footage comes from multiple body worn cameras and captures a limited field of view of the officers' actual use of force. It confirms that Officers Boro and Beecroft, as well as Officer Krahn, grabbed Lux, but their cameras are, as a result, inches from him. (*See* ECF No. 54-2 at 14:54–15:02; ECF No. 55-4 at 18:04–18:20.) The footage is chaotic and inconclusive, and, at crucial times, blurry and unfocused. (*See e.g.* ECF No. 55-4 at 18:17–18:20.) In addition, the events occurred at night, and the video is largely dark during key moments, precluding any definitive interpretation of the events recorded. (*See, e.g.*, *id.* at 18:06–07); *Perez*, 173 F.4th at 865. As a result, a number of key issues simply cannot be resolved based on the video evidence. These disputed issues include: (1) whether Lux was actively resisting at the time Officer Beecroft tased him; (2) whether he was incapacitated by that first taser deployment when Officer Boro tased him a second time; and (3) whether he was still incapacitated by the first two taser deployments while tased on the ground a third time (or was simply no longer actively resisting while prone on the ground). As a result, the body worn camera footage simply does not conclusively establish that Defendant's version of the facts in dispute is correct.

When parties assert different characterizations of the facts, the Court must view the record in the light most favorable to the non-moving party. *Sears, Roebuck & Co.*, 233 F.3d at 437. The Court cannot weigh credibility or assess the weight of conflicting evidence at summary judgment. *Reinebold*, 18 F.4th at 927. Lux asserts that he was not actively resisting when the officers first attempted to handcuff him. (ECF No. 61 ¶61.) Officers Boro and Beecroft assert they felt Lux stiffen his arms, and that he attempted to "shift[] his bodyweight downward, and lean" backwards. (ECF No. 61 ¶70.) The Court cannot resolve this dispute.

The record confirms that multiple officers grabbed Lux's limbs while he was standing but did not handcuff him. (ECF No. 61 ¶¶57–58, 61, 64, 70.) They later tased him three times. (ECF No. 61 ¶76–77, 85.) In determining whether the use of force was reasonable, the Court must look

to the totality of the circumstances, including the severity of the suspected crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to flee. *Morfin v. City of E. Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003). Construing the disputed facts in the light most favorable to Lux, a reasonable jury could find, based on Lux's version of events, that the use of significant force by Officers Boro and Beecroft was not objectively reasonable. Among other relevant facts, Lux was suspected of driving while intoxicated, not a violent felony. Officers Boro and Beecroft had no reason to believe he was armed and, in fact, he was not. Police officers had spoken to Lux for roughly 15 minutes before he was tased, and during that time he had not attempted to flee or acted aggressively towards them. (*See, e.g.*, ECF No. 55-4 at 2:07–17:28.) He had also voluntarily completed three field sobriety tests. (ECF No. 61 ¶40.) While Lux did not immediately put his hands behind his back when he was arrested, he did not kick, punch, or attempt to strike the officers. When he was tased the third time, he was on the ground, prone, with taser probes in his torso, and five officers on the scene surrounding him. (ECF No. 61 at 89.) Defendants do not dispute that he had also been incapacitated by Officer Boro's taser deployment seconds earlier. (*Id.*) On these facts—involving a minor crime with an unarmed suspect who, by the time of the last taser deployment, had already been tased and was potentially incapacitated while prone on the ground—a reasonable jury could find that Officers Boro and Beecroft's use of force was excessive. *Cyrus*, 624 F.3d at 863; *Alicea*, 815 F.3d at 292; *Abbott*, 705 F.3d at 729–30.

Defendants try to support their use of force by citing their prior knowledge of Lux's past propensity for violence and being disruptive.[2] (ECF No. 52 at 3.) But they support this claim with generic assertions from Officers Boro and Beecroft without providing any basis for these conclusory statements. (ECF No. 55 ¶103; ECF No. 56 ¶66; ECF No. 54 ¶66.) Moreover, Lux disputes their contention and insists he had never previously been violent and that he was only known to police because he had sued the Whitewater Police Department some years before. (ECF No. 64 ¶¶6–7.) At this point, on this record, the Court cannot credit Defendants' argument that their general past knowledge of Lux's character justified repeatedly tasing him.

Next, Defendants cite three Seventh Circuit cases, which they argue support their contention that their repeated taser use was objectively reasonable because Lux posed a threat to

[2]Oddly, Defendants also assert that their prior familiarity with Lux did not influence their conduct during this incident. (ECF No. 55 ¶102; ECF No. 56 ¶65; ECF No. 54 ¶65.)

the officers' safety and continued to actively resist their efforts to arrest him. (ECF No. 52 at 11 (citing *Clarett*, 657 F.3d at 674–75; *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011); *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010).) But the cases Defendants rely upon are all readily distinguishable. In *Clarett*, the plaintiff appealed the denial of her motion for judgment as a matter of law and for a new trial after a jury verdict for the defendant officers. 657 F.3d at 667–68. She had been tased three times by police after they entered her home to question her sons. *Id*. The Court of Appeals rejected her argument for reversal, confirming that the verdict was sufficiently supported by the evidence, including testimony that the plaintiff had blocked defendants' path and had kicked and flailed at them *after* she was first tased. *Id*. Here, the case remains at summary judgment and there is no evidence that Lux attempted to strike the officers, kick them, or otherwise assault them before being tased. Indeed, it is undisputed that he was prone on the ground after being tased. *Norris* similarly does not help Defendants. In that case, a criminal defendant was tased in connection with the execution of a search warrant at his home. *Norris,* 640 F.3d at 297–98. The record confirmed that officers tased defendant after he reached for his waistband, hid his hands from officers, and refused multiple commands to show them, leading them to believe he was armed. *Id.* at 295, 297–98, 303. And he was in fact armed with a pistol. *Id.* at 298. Here, Lux was unarmed, and the officers had no reason to believe he was armed. Finally, in *Forrest*, a pre-trial detainee sued under the Fourteenth Amendment after he was tased while refusing to comply with a strip search. 620 F.3d at 745–46. The arrest involved a felony and the plaintiff had already attacked an officer earlier in the night, was pacing in the cell, clenching his fists, yelling obscenities and had repeatedly been told that if he did not comply he would be tased. *Id.* at 745. None of those facts are present here.

Defendants also argue that the presence of bystanders justified their repeated taser deployments. (ECF No. 52 at 14.) They analogize this case to *Lash v. Lemke*, 971 F. Supp. 2d 85, 95 (D.D.C. 2013) *aff'd* 786 F.3d 1 (D.C. Cir. 2015), an out-of-circuit decision in which the court granted summary judgment on an excessive force claim arising from a plaintiff's arrest within a tent encampment during the "Occupy DC" protests. *Id.* at 88. In that case, the defendant officers were posting notices instructing protestors to move their tents, when they were confronted by multiple protestors who interfered with this effort. *Id.* at 88–89. The plaintiff "burst[] out of one of the tents," confronted the officers by yelling and clapping in their faces, and then pursued them as they tried to walk away. *Id.* at 89, 95–96. They ultimately arrested him after he threw away

notices, continued yelling at the officers, and attempted to pull a wooden stake out of the ground. *Id.* at 89–90. He resisted their initial effort to arrest him, and he was tased once. *Id.* Throughout these events, many protestors continued yelling at the officers. Unlike in *Lash*, the officers here did not attempt to arrest Lux in the middle of a large and agitated crowd in a protest encampment. *Id.* at 94. The crowd was modest in size and the video confirms that it stayed back on the sidewalk, consistent with officers' instructions. While the individuals on the sidewalk engaged in sporadic yelling, the Court cannot conclude that this was the same chaotic situation faced by the defendants in *Lash*.

Finally, Defendants cite *Snukis v. Taylor*, 145 F.4th 734, 741 (7th Cir. 2025), and argue they did not need to "interrupt their delivery of force between each event to give an individual a chance to comply. (ECF No. 52 at 14.) Defendants' analogy to *Snukis* is misplaced. There, the plaintiff-decedent had a violent struggle with police officers during which he struck a police officer, continued to struggle with the officers, was tased, began to pull the taser probes from his chest, was tased again, then managed to pull the probes from his chest and flee. *Id.* at 738. As the officers pursued him, the decedent tripped and fell. When the officers then attempted to handcuff him, he tried to grab an officer's genitals, reached for the officer's holster, and grabbed his leg. *Id.* While trying to free himself, that officer struck the decedent in the head repeatedly. *Id.* Unlike Lux, the decedent in *Snukis* was never incapacitated and repeatedly tried to harm the officers who were arresting him. Here, the parties agree that Lux was incapacitated (at least by the second tasing) and he never attempted to strike an officer. (ECF No. 61 ¶89.) Using force repeatedly without interruption to effectuate the arrest in *Snukis* was reasonable. *Snukis*, 145 F.4th at 741. But that does not mean it was reasonable for Officer Boro to similarly continue with an uninterrupted delivery of force against a suspect who was "uncooperative but subdued" while prone on the ground. *Id.* at 740.

For the reasons discussed above, the Court concludes that Lux has presented sufficient evidence to allow a reasonable jury to find that Officers Boro and Beecroft violated his rights by using excessive force while arresting him. While a jury, able to weigh credibility and determine facts, may very well find that Defendants' actions were reasonable, the Court cannot make that determination here.

### B. Under Lux's Version of Events, Officers Boro and Beecroft Would Not Be Entitled to Qualified Immunity.

Government officials enjoy qualified immunity from suits under Section 1983 if their conduct does not clearly violate established law. *Zorn v. Linton*, 607 U.S. 568, 571 (2026) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). "Qualified-immunity analysis usually entails a two-step inquiry: we ask (1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery*, 911 F.3d at 466 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A right is clearly established when it is sufficiently clear such that every reasonable official would have understood that his actions violated the right and existing precedent places the constitutional question beyond debate. *Zorn*, 607 U.S. at 572 (citing *Rivas-Villegas*, 595 U.S. at 5). To determine that a right is clearly established, courts generally must identify a case where an officer acting under similar circumstances was held to have violated the Constitution. *Id.* (citing *Escondido v. Emmons*, 586 U.S. 38, 43 (2019)). "The relevant precedent must define the right with a 'high degree of specificity' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Id.* (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

In answering the first question, the Court must construe contested facts in Lux's favor. *See Sears*, 233 F.3d at 437; *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005). As discussed above, a reasonable jury could determine that Lux's rights were violated. Crediting Lux's version of events (to the extent it is supported by the summary judgment record), Officers Boro and Beecroft would not be entitled to qualified immunity. It was well established in 2021 that officers may not continue to use significant force on a subdued, incapacitated, or only passively resisting suspect. *See Cyrus*, 624 F.3d at 863; *Abbott*, 705 F.3d at 732 ("[I]t was well established in 2007 that police officers cannot continue to use force once a suspect is subdued.")

## II. Officer Krahn is Entitled to Summary Judgment Because His Use of Force Was Minimal and Objectively Reasonable.

The record concerning Lux's claim against Officer Krahn is materially different than his claims against the other two officers. Lux's claim against Officer Krahn is that he used excessive force by employing a taser against Lux and then pressed his face into the ground. (ECF No. 64 ¶¶50–51, 54.) These allegations are directly refuted by conclusive video evidence. *Perez*, 173

F.4th at 865 (citing *Scott,* 550 U.S. at 380); (ECF No. 56 ¶48; ECF No. 56-2.) The Court will therefore grant summary judgment as to Lux's claim against Officer Krahn and dismiss him from this action.

Officer Krahn maintains that he is entitled to summary judgment because, contrary to Lux's claim, he did not use his taser during the encounter and his body worn camera footage confirms this fact. (ECF No. 56 ¶48; ECF No. 56-2.) According to the video evidence, Officer Krahn walked to Lux as the other officers attempted to move his hands behind his back and he then grabbed one of Lux's arms as well. (ECF No. 56-2 at 15:03–15:10.) When Officer Beecroft first used his taser, Officer Krahn stepped back and away from Lux. (*Id.* at 15:11–15:14.) After Lux fell to the ground, Officer Krahn then walked around Lux and put his hand on Lux's shoulder but quickly withdrew it. (*Id.* at 15:14–15:18.) Officer Krahn then stood up, moved to the crowd of bystanders, and told them to "back up" and "stay back." (*Id.* at 15:18–19:12.) Officer Krahn continued to stand near the bystanders and did not return to Lux while he was on the ground. (*Id.* at 15:20–22:15.) This video evidence directly contradicts Lux's declaration, in which he asserts that Officer Krahn tased him and then forced his face into the sidewalk for several minutes. (ECF No. 64 ¶¶50, 54.) The footage further establishes that his actual use of force was objectively reasonable under the circumstances. *See Graham*, 490 U.S. at 396–97.

Because the video evidence clearly establishes that Officer Krahn's use of force was objectively reasonable—he attempted to move Lux's arm during an arrest and briefly put his hand on or pressed Lux's shoulder—he is entitled to summary judgment on Lux's claim against him and will be dismissed from this action.[3]

## CONCLUSION

For the reasons discussed above, the Court will grant Defendants' motion for summary judgment in part and dismiss Lux's excessive force claim against Officer Krahn. But the Court must deny Defendants' motion in part, and Lux's excessive force claim against Officers Boro and Beecroft survives.

[3] Further, while Lux references failure to intervene claims in passing his briefing, (ECF No. 62 at 4), he has not successfully pleaded a failure to intervene claim. While Lux included a failure to intervene claim in his amended complaint, that claim related to the officers' failure to intervene to prevent an equal protection violation. (ECF No. 14 ¶¶39–42.) Lux's equal protection claim, and his derivative failure to intervene claim, were dismissed earlier in this case. (ECF No. 44 at 1–3.) His amended complaint does not include a failure to intervene claim related to his excessive force claim. (*See* ECF No. 14 ¶¶47–54.) The Court declines Lux's implicit, and extremely underdeveloped, invitation to amend the complaint at this late date. *See Schmees v. HCI.COM, Inc.*, 77 F.4th 483, 488–89 (7th Cir. 2023).

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 51, is **GRANTED in part** and **DENIED in part**. Plaintiff's claim against Officer Krahn is dismissed. Plaintiff's claim against Officers Boro and Beecroft will proceed to trial.

Dated at Milwaukee, Wisconsin on September 28, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge